**MARS et al. v. PANHANDLE & S. F. RY. CO. et al.**

**No. 12241.**

Court of Civil Appeals of Texas. Fort Worth.

Dec. 21, 1929.

Rehearing Denied Feb. 8, 1930.

Templeton & Templeton, of Fort Worth, for appellants.

Lee, Lomax & Wren, of Fort Worth, for appellees.

BUCK, J.

In this case W. W. Mars and his son, Bert Mars, shipped some 127 cattle from White Deer, some 42 miles northeast of Amarillo. All of them were shipped from White Deer to Sweetwater, via the Panhandle & Santa Fé Railway Company. The three cars, the cattle in question, were routed over the Gulf, Colorado & Santa Fé Railway Company, from Sweetwater to Brownwood, thence to Temple, thence to Cleburne, and thence to the destination at Parsons, between Cleburne and Weatherford. There were some other cattle bought by the Messrs. Mars and sold by them at White Deer, but which were routed over the Fort Worth & Denver City Railway Company to Hogsett, some 20 or 25 miles north of Fort Worth. The plaintiffs alleged that the cattle were wrongfully and negligently unloaded at Amarillo, and placed in pens that were very muddy, and that they were negligently held and kept in said pens until some time on the succeeding day, when they were reloaded and sent on to their destination. Plaintiffs also alleged that the defendants were negligent in failing to provide proper and suitable pens at Amarillo in which to unload and hold such cattle. The cattle were shipped from White Deer, in Carson county, leaving there at 8 p. m., October 15, 1925. They were sent out to the yards to be unloaded at 2 a. m., October 16, 1925. The unloading was completed at 3:15 a. m., October 16, and the cars were reloaded and shipped out via Panhandle & Santa Fé Railway Company at 10:15 a. m., October 16. The cattle were fed and watered at Amarillo. The shipment was delivered at Slayton, Tex., at 10:45 p. m., October 16. The train left Slayton at 12:40 a. m., October 17, and arrived at Sweetwater at 6:05 a. m., October 17, where they were unloaded, fed, and watered, and these three cars were reloaded over the Gulf, Colorado & Santa Fé at 4:15 p. m., October 17. They reached Brownwood at 5:15 a. m., October 18. The shipment left Brownwood at 3:20 p. m., October 18, and reached Temple at 10:20 p. m. The shipment left Temple at 12:20 a. m., October 19, and reached Cleburne at 7 a. m., October 19. They left Cleburne at 9:25 a. m., October 19, and reached Parsons at 11:15 a. m., where said cattle were unloaded.

The evidence shows that the distance from White Deer to Amarillo was 42 miles, and the distance from Amarillo to Slayton was 136 miles. The distance from Slayton to Sweetwater was 106 miles; the distance from Sweetwater to Brownwood was 113 miles; from Brownwood to Temple 133 miles; from Temple to Cleburne 100 miles; and from Cleburne to Parsons was 28 miles. There were 21 cars of cattle loaded at White Deer in a train consisting of 56 cars besides the caboose. From Amarillo to Slayton there were 54 cars in the train, 17 cars of livestock, 6 empty stock cars, 1 car of cotton, 3 empty tank cars, 7 cars of merchandise, 4 cars of automobiles, 2 cars of flour, 2 cars of wheat, 1 car of coal, 1 car of tile, 1 car of matches, 2 cars of shingles, 3 cars of oil, 1 car of soap, 2 cars of machinery, and the caboose. At Tulia, between Amarillo and Slayton, there was set out 1 car, and 5 cars at Plainview, 3 cars at Abernathy, 10 cars at Lubbock, and the train picked up 8 cars at Lubbock. There was no caretaker with the shipment, but the trainmen all testified that the shipment on their respective divisions of the road was made in good time, without any rough handling, and that the cattle were in good condition. The evidence shows that the cattle, when they reached Parsons, were in good condition, though tired.

The evidence further shows that the cattle were sold by Mars and his son to James D. Farmer, acting for T. H. McFarland, the purchaser, for 7 cents per lb. delivered at Parsons or McFarland's Switch, which two stations were close together, but they were really delivered at Parsons on account of there being no scales at McFarland's Switch.

John F. Witherspoon went from Fort Worth to Parsons on Monday October 19, 1925, to receive the cattle, and both he and McFarland testified that the cattle, when they reached Parsons, were in good condition, and no evidence of rough handling. They testified that the cattle were a good grade of white-faced cattle, coming 2 years old. According to the contract between the purchaser and the vendor, the cattle were watered and allowed to graze in a pasture until they were filled with water and grass. When they were weighed, it was found that the total weight was 77,860 pounds, or a little more than 613 pounds to the steer. Mr. Mars thought that the cattle would weigh from 700 to 750 pounds per head. Mr. Farmer said that he bid by the head and by the pound, and that he thought the cattle would weigh a little less than 700 pounds, and that Mr. Mars accepted the bid by weight to be shown at destination; that he thought that the cattle would weigh less than 700 pounds, and that he would save his principal a little money by buying by the weight instead of by the head; that he paid the usual price current over the country for the cattle.

A jury was impaneled by the trial court, and, upon the conclusion of the testimony, the court concluded that there was no evidence to show that the defendants or either of them had been guilty of any negligence in the handling of the cattle, and, in the absence of proof, that the cattle were not transported in the usual and customary time, instructed a verdict for the defendants. Upon this verdict, the court rendered judgment for the defendants, and from this judgment the plaintiffs have appealed.

### Opinion.

The main question involved in this case is the ruling of the court in excluding the testimony of W. W. Mars as to what was the usual and customary time to make the shipment. He testified that he had had some 50 years of experience in raising, handling, and shipping cattle. He further testified that he had never been over the route taken by the shipment on a freight train, and had never accompanied a shipment of cattle over such route. He testified that shipping cattle affected their weight, and that he would judge that for the first 24 hours of shipment the cattle would lose something like 10 per cent. of their weight; that such loss would be due to the offal; that cattle taken off of pasture would lose this weight from the excretion from their bowels, but for the next 24 hours the cattle would lose some flesh. But when he attempted to testify as to the usual and customary time for making a trip of the kind and extent of the one in question, upon objection of the defendants' counsel, the court excluded the testimony as to what was the usual and customary time.

We are of the opinion that the trial court did not err in excluding said testimony.

Before a witness can qualify as an expert, he must show that he is well acquainted with the facts and circumstances concerning which he offers his expert testimony or opinion evidence. Injury or depreciation is naturally and necessarily caused by long shipments, even when the carriers exercise due care and diligence in the transportation. For such injury or damage not occasioned by the carrier's negligence, no recovery can be had. St. Louis, I. M. & S. Ry. Co. v. Moon, 47 Tex. Civ. App. 209, 103 S. W. 1176; St. Louis Southwestern Ry. Co. v. Smith, 33 Tex. Civ. App. 520, 77 S. W. 28, 29; International & G. N. Ry. Co. v. Young (Tex. Civ. App.) 72 S. W. 68; Atchison, T. & S. F. Ry. Co. v. Abercrombie (Tex. Civ. App.) 283 S. W. 294.

T. H. McFarland testified: "The cattle were unloaded and turned out in the pasture and driven to a tank and grazed for a considerable time, and then driven back in the pens and weighed. The pasture was adjacent to the pens, I suppose a couple of 100 yards off. The cattle were in good shape when they arrived, but a little gaunt. They filled out all right. * * * They did not appear to be unusually tired and worn, but they were tired. Yes, all cattle are tired that way. They were tired, yes."

John F. Witherspoon, a witness for plaintiff, testified: "I weighed these cattle upon their arrival at Parsons. * * * The average weight of those cattle at the time I weighed them was a little over 613 pounds. That was the average of the bunch. * * * We unloaded these cattle and turned them out of the pens, grazed them down towards the tank, and they crossed across the tank, and we turned them back and they came back across the tank again, and they went across the side of the hill, grazed on the side of the hill, and when they commenced lying down —there must have been 12 or 15 of them commenced lying down—I told Mr. McFarland we would weigh them. They were weighed after they were grazed and watered. * * * We gave them ample time to drink and graze."

W. W. Mars testified that he thought the cattle would weigh 700 pounds when he and his son sold them; that they were in a good condition and what he would call grass fat, though not "finished fat." He further testified that he thought the cattle would have weighed 750 pounds a head up at White Deer.

Bert Mars testified that he figured the cattle would weigh right at 700 pounds a head at White Deer.

James D. Farmer, an experienced buyer and seller of cattle, living at Fort Worth, with an office at the Stock Yards Exchange, testified: "I have a good deal of experience in judging and guessing at the weights of cattle, but I am going to tell you right now that I am not an expert. I am not going to qualify as an expert in guessing weight. To show you

what I am getting at—If I state anything I should not, why, stop me—I bid Mr. Mars both ways. I bid him by the head and by the pound. Of course, he was so sure of his weights he took the bid by weight, instead of by the head. I was guessing them to weigh here a little under what he was; not very much but just a little bit. I thought they would weigh a little less than 700. He thought they would weigh 700. I thought my price per pound was a little less money for him, for the man I was buying them for, that is, the man I was doing business for."

In Wigmore on Evidence, vol. 1, p. 674, it is said:

"Whatever general rules of this sort have been vouchsafed are dealt with under the various topics of testimony (post, secs. 564–571). But commonly there can be no such general propositions for the topic at large. The decision must be a concrete one, i. e., upon the fitness of the individual witness, as shown by the circumstances of his experience. Here two rules of method come into application: (1) The possession of the required qualifications by a particular person offered as a witness, must be expressly shown by the party offering him. This follows from the nature of the situation (ante sec. 556), and is universally conceded. It marks a contract between this and the foregoing sorts of testimonial capacity (ante, sec. 484).

"Same: (2) Discretion of the Trial Court. (2) Secondly, and emphatically, the trial court must be left to determine, absolutely and without review, the fact of possession of the required qualification by a particular witness. In most jurisdictions it is repeatedly declared that the decision upon the experiential qualifications of witnesses should be left to the determination of the trial court."

■ We think under the practice in this state the decision of the trial court is left to his judicial discretion.

■ The statement of a witness that he testifies from his knowledge does not necessarily qualify him to testify as an expert. He must show that he has such experience and has knowledge as would qualify him to testify as an expert. Gulf, W. T. & P. Ry. Co. v. Staton (Tex. Civ. App.) 49 S. W. 277. In Gulf, C. & S. F. Ry. Co. v. Kimble, 49 Tex. Civ. App. 622, 109 S. W. 234, by the Austin Court of Civil Appeals, it is said that a person is not competent to give his opinion as to what is the usual and customary time required for the transportation of a shipment of cattle from one point to another where his opinion is based on only one shipment testified to by him. For perhaps a contra holding, see Texas & N. O. Ry. Co. v. Farrington, 40 Tex. Civ. App. 205, 88 S. W. 889.

■ There is some contention that the shipper was instructed to ship the cattle from Sweetwater over the Texas & Pacific Rail-

way to Weatherford, and from there over the Gulf, Colorado & Santa Fé Railway to their destination; that by this choice of routes the cattle would have been delivered in much less time. Mr. James D. Farmer, the purchaser's agent, and not the shipper, testified: "I just gave him [the railroad's agent at White Deer] billing and he took it down. I did not tell him how I wanted the cattle routed. I told him then I wanted them [the cattle] to go just as the train went down, thinking they would get a good routing, and not be loafing along. I did not state anything about how they should be routed. And I knew how the others were coming. I told him I wanted them to go with the other shipment, that is, with the other cattle. When I gave the agent the billing, I gave him that information that they should go with the other cattle, because we could get a run on the cattle then." The other cattle to which the witness referred doubtless were the 500 head of cattle sold to Loon Farmer (J. D. Farmer's cousin) and C. B. Team, which were shipped over the Texas & Pacific Railway from Sweetwater to Iona, just east of Weatherford. The evidence shows that, if the shipment had been routed by the Texas & Pacific Railway to Weatherford, and thence over the Santa Fé to Parsons, the mileage would have been less, but the cattle could not have been delivered at Parsons even as early as they were delivered, owing to the fact that the train running out of Weatherford on the Gulf, Colorado & Santa Fé Railway is a mixed train, and does not run on Sunday, the day the cattle would have been due to have been shipped out of Weatherford, and the cattle would have had to wait for the Monday train, which reached Parsons even later Monday than the train from Cleburne reached there.

Therefore we conclude at least no injury is shown by the failure of the three cars of cattle to be shipped out of Sweetwater via the Texas & Pacific Railway to Weatherford.

Farmer testified that just before the cattle train left White Deer he told Bert Mars to go down to the depot and sign the bill of lading. Mars testified that he went down there and signed the bill of lading. By this bill of lading the cattle were routed from Sweetwater over the Gulf, Colorado & Santa Fé Railway.

■ From what has been said, we conclude that the admitted evidence fails to show that there was any unusual delay in the shipment, either in the running time or at the division points, or any negligent conduct on the part of defendants that would have probably caused any unusual loss of weight in the cattle. From Sweetwater there were only three cars of these cattle forwarded, and a railroad company is not required to forward a shipment of only three cars, but may wait for the regular freight train, which the defendant did.

1008

On the whole, we do not find that the record discloses any unusual delays, either at the feeding points or in running time.

We conclude that the judgment below must be affirmed, and it is so ordered.